Roland Tellis (SBN 186269)
rtellis@baronbudd.com
David Fernandes (SBN 280944)
dfernandes@baronbudd.com
Isaac Miller (SBN 266459)
imiller@baronbudd.com
**BARON & BUDD P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818.839.2333

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (*pro hac vice* application
forthcoming)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

***Attorneys for Plaintiff and the Proposed Class***

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JACQUELINE JACKSON, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>DIAGEO NORTH AMERICA, INC.,<br><br>Defendant. | CASE NO. 3:25-cv-5654<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## I.    **INTRODUCTION**

1.      This case exposes a high-stakes deception at the heart of the premium tequila market. Despite labeling and advertising Don Julio and Casamigos as "100% agave," Defendant Diageo North America, Inc. ("Diageo") has been selling tequila that contains cheaper, non-agave alcohol, misleading consumers across the country.

2.      Seeking to capitalize on consumer demand for authentic, high-quality tequila, Diageo labels every bottle of Casamigos Blanco, Jalepeño, Reposado, Cristalino, and Añejo tequila (collectively "Casamigos Premium Tequila") as "Tequila 100% Agave Azul" and every bottle of Don Julio Blanco, Reposado, Añejo, 70 Cristalino, Alma Miel, Rosado, 1942, Ultima Reserva, Primavera (collectively "Don Julio Premium Tequila") as either "100% de Agave" or "100% Agave."

3.      These designations tell consumers that Casamigos Premium Tequila and Don Julio Premium Tequila (collectively "Diageo Premium Tequila Products") are made solely from the Blue Weber agave plant, with no other sugars or non-agave sources used in the fermentation process.

4.      But recent scientific testing, including nuclear magnetic resonance (NMR) and isotope testing, reveals the significant presence of non-agave sugars in Diageo Premium Tequila Products. These findings contradict Diageo's "100% agave" representations and confirm its tequilas are adulterated.

5.      By falsely branding Diageo Premium Tequila Products as "100% agave," Diageo misled consumers, distorted the premium tequila market, and profited from a deception that violates the core principles of consumer protection law.

6.      This lawsuit seeks to hold Diageo accountable and recover financial losses sustained by consumers who were misled by its false and misleading advertising.

## II.    **JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises from violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* (RICO), This Court also has subject matter jurisdiction over this

action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

8.      This Court may also exercise supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because they are so related to the RICO claim (within the Court's original jurisdiction) that they form part of the same case or controversy under Article III of the United States Constitution. This case does not present novel or complex issues of state law that predominate over claims for which this Court has original jurisdiction, and there are no compelling reasons for declining supplemental jurisdiction over those of Plaintiff's claims that do not arise under RICO.

9.      This Court has personal jurisdiction over Diageo under California Code of Civil Procedure section 410.10. Diageo purposefully availed itself of the privilege of conducting business in California. Although Diageo is a Connecticut corporation, it is registered to do business in California. Diageo markets, advertises, distributes, and sells the Diageo Premium Tequila Products in California. On information and belief, the marketing, advertising, distribution and sale of the Diageo Premium Tequila Products would have required Diageo to enter into contracts with entities in California.

10.     Plaintiff's claims arise out of Diageo operating, conducting, engaging in, or carrying on business in California. Specifically, Plaintiff purchased the Diageo Premium Tequila Products in California and recalls seeing advertisements for those products in California. Therefore, her injuries arise out of Diageo's marketing, advertising, distribution, and sale of the Diageo Premium Tequila Products in California.

11.     Diageo targeted Class members in each of the fifty states, including California, with advertising for the Diageo Premium Tequila Products; purposefully directed their activity to the fifty states, including California; and controlled the distribution and sale of the Diageo Premium Tequila Products itself.

12.     Pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965, venue is appropriate in this

District because a substantial part of the events or omissions which gave rise to the claims occurred in this District, Diageo marketed, advertised, and sold Diageo Premium Tequila Products within this District, and Plaintiff and Class Members purchased Diageo Premium Tequila Products in this District.

13.     This action is properly assigned to the San Francisco Division, pursuant to N.D. Cal. Civil Local Rule 3-2(c), (e) and the Court's Assignment Plan (General Order No. 44), because this action arises in San Francisco County.

### III.     PARTIES

**A.     Plaintiff**

14.     Plaintiff Jacqueline Jackson is a resident of San Francisco, California. Between April and May 2025, she purchased at least four (4) bottles of Don Julio Blanco tequila at Safeway and Total Wine in Daly City, California. When purchasing the Diageo Premium Tequila Products, Plaintiff Jackson saw and relied on Diageo's "100% agave" label claims.

**B.     Defendant Diageo North America, Inc.**

15.     Diageo is a Connecticut corporation. Diageo maintains its principal place of business and headquarters in New York and is licensed to do business in California.

### IV.     COMMON FACTUAL ALLEGATIONS

**A.     U.S. and Mexican law strictly regulate the definition and labeling of tequila.**

16.     In the United States, the Alcohol and Tobacco Tax and Trade Bureau ("TTB") regulates tequila under 27 C.F.R. § 5, which governs the labeling, packaging, and advertising of distilled spirits.

17.     Section 5 defines tequila as "[a]n agave spirit that is a distinctive product of Mexico," and requires that it "be made in Mexico, in compliance with the laws and regulations of Mexico governing the manufacture of Tequila for consumption in that country." 27 CFR § 5.148.

18.     Under Mexican law, tequila is regulated by the Official Mexican Standard NOM-006-SCFI-2012 (the "Tequila NOM"),[1] which sets detailed requirements for the production,

---

[1] https://www.crt.org.mx/wp-content/uploads/2024/01/NOM-006-SCFI-2012%20-%20INGLES.pdf.

**CLASS ACTION COMPLAINT**

labeling, and marketing of tequila.

19.    The Tequila NOM defines two categories of tequila based on the percentage of agave sugar content: (1) "100% agave" and (2) "tequila" or "mixto." To qualify as "100% agave," a tequila's "fermentation may not be enhanced with sugars other than those obtained from the *tequilana weber* blue variety Agave." NOM-006-SCFI-2012 § 5.1.1. These products "must be labeled using one of the following statements: '*100% de agave*,' '*100% puro de agave*,' '*100% agave*,' or '*100% puro agave*,' to which the word 'azul' ["blue"] may be added." *Id.* In contrast, "mixto" tequilas may contain up to 49% non-agave sugars, typically from sugarcane. *Id.* § 5.1.2.

20.    The Tequila NOM classifies tequila based on their characteristics after distillation. For example, tequila may be classified as *Blanco or Plata* ("Silver"), *Joven or Oro* ("Gold"), *Reposado* ("Aged"), *Añejo* ("Extra-aged"), or *Extra Añejo* ("Ultra-aged"). NOM-006-SCFI-2012 § 5.2.1.

21.    To prevent adulteration, the Tequila NOM imposes strict documentation requirements. For example, under Section 6, Authorized Producers of tequila are required to "maintain updated records of at least the following documents: a) Invoices or documents confirming the purchase of the raw materials (Agave and other sugars). b) Documents confirming raw material input and output. c) Documents confirming the movement of the finished product. d) Inventories of raw materials and finished product, including, specifically, the finished product allocated to aging or bottling." NOM-006-SCFI-2012 § 6.5.2.1.

22.    The organization that has taken charge of ensuring compliance with the Tequila NOM is the Consejo Regulador Del Tequila A.C. ("CRT"), or Tequila Regulatory Council.[2] One of the CRT's primary objectives is to "[g]uarantee the authenticity of Tequila to the consumer."[3] According to its website, the CRT "is approved by the General Bureau of Standards of the Ministry of Economy and is accredited by the Mexican Accreditation Entity A.C. to perform its

---

[2] Consejo Regulador Del Tequila A.C., *About Us*, CRT.ORG, https://www.crt.org.mx/en/about-us/ (last visited June 6, 2025).
[3] *Id.*

**CLASS ACTION COMPLAINT**

duties as an Inspection Unit, Testing Laboratory and Certification Body."[4]

23.    Although CRT presents itself as a regulatory body, it is not a governmental entity. Rather, it is a private non-profit organization composed of members from across the Agave-Tequila production chain, including agave growers, Tequila producers, bottlers, distributors, marketers, and government liaisons.[5] Notably, CRT's Board of Directors includes Diageo México Comercializadora, S.A. de C.V. ("Diageo Mexico") as First Vice President, Brown-Forman Tequila Mexico, S. de R.L. de C.V. as Second Vice President, and Destiladora Gonzalez, S.A. de C.V. as Treasurer.[6] These three entities—along with other tequila producers such as Tequila San Matías de Jalisa, S.A. de C.V.,[7] Tequila Sauza, S. de R.L. de C.V.,[8] Campari Mexico,[9] Tequila Cascahuin, S.A.,[10] Casa Cuervo, S.A. de C.V.,[11] Pernod Ricard México, S.A. de C.V.,[12] and Tequila Casa de los Gonzales, S.A. de C.V[13]—also dominate CRT's committees. In effect, the very companies that CRT purports to regulate are the ones running it.

24.    In a lawsuit filed in the Middle District of Florida earlier this year, CRT described itself as "the *only* body accredited and approved under Mexican law to inspect, analyze, and certify compliance with the [Tequila NOM]." *Consejo Regulador Del Tequila A.C. v. Additive Free Alliance, Inc.*, Case No. 3:25-cv-00236-WWB-MCR, Dkt. 1, at 1 (M.D. Fla. Mar. 4, 2025) (emphasis in original). "In addition to certifying compliance with the Tequila NOM," the lawsuit explains, the "CRT is also responsible for substantiating fact-based claims on labels of Tequila, such as whether a product is made from 100% Agave or whether the Tequila meets the criteria for being classified as Blanco, Reposado, or Añejo." *Id.*

25.    Among its core responsibilities, the CRT is required to conduct extensive inspections throughout the tequila production chain, beginning with the verification that only

---

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.* (Chairman of Technical Inspection Committee).
[8] *Id.* (Chairman of Certification Technical Committee).
[9] *Id.* (Chairman of Standardization Committee).
[10] *Id.* (Vice-chairman of External Affairs Committee).
[11] *Id.* (Chairman of Joint Committee for the Defense of Tequila and Agave).
[12] *Id.* (Chairman of Institutional Relations Committee).
[13] *Id.* (Chairman of Legal Affairs Committee).

Blue Weber agave cultivated within the designated geographic region is used.[14]

26.    Under the "Continuous Verification" provisions of the Tequila NOM—which are intended to assess compliance with tequila authenticity requirements—the CRT is further charged with monitoring production practices on-site, including cooking, fermentation, distillation, and aging. *See* NOM-006-SCFI-2012 § 8.5.

27.    Aside from the inspection and continuous verification procedures, the CRT is also required to perform laboratory testing of tequila samples to verify key physicochemical parameters such as alcohol content, sugar concentration, and the presence of non-permitted additives.[15] According to the CRT website, its "laboratory plays a crucial role in the tequila certification process by providing accurate and reliable results."[16] These tests are supposed to help ensure that only authentic, unadulterated tequila is certified for domestic and international sale.[17]

28.    Notably, the CRT also "owns an incontestable federal registration for the certification mark TEQUILA (Registration No. 5225126)." *Consejo Regulador Del Tequila A.C.*, Case No. 3:25-cv-00236-WWB-MCR, Dkt. 1, at 6. Because CRT holds the U.S. certification mark, only producers certified by the CRT can legally use the term "Tequila" on products sold in the United States. *Id.* at 7. In other words, CRT's control over the U.S. certification mark, combined with its role under Tequila NOM, makes it the sole gatekeeper for what qualifies as "100% Agave" tequila under both Mexican and U.S. law. *See* NOM-006-SCFI-2012 §§ 10, 11. This monopoly gives CRT significant influence over producers, including foreign companies like Diageo, by conditioning market access on CRT certification.

**B.    Tequila's popularity soars as consumers embrace premium, "100% agave" labels.**

29.    Because tequila labeling is strictly regulated, the "100% agave" designation signals authenticity, purity, and compliance with both U.S. and Mexican standards. It is more than a technical term—it is a powerful marketing tool that shapes consumer expectations and

---

[14] *Id.*
[15] Consejo Regulador Del Tequila A.C., *Laboratory*, CRT.Org, https://www.crt.org.mx/en/laboratory/ (last visited June 6, 2025).
[16] *Id.*
[17] *Id.*

**CLASS ACTION COMPLAINT**

drives growth in the premium tequila market.

30.    A recent *Forbes* article reports that premium tequila sales have grown 1,270% since 2003, with super-premium brands up 1,500% over the same period.[18] This surge reflects a shift: consumers are no longer chasing volume but instead seeking high-quality, craft spirits rooted in traditional production methods and ingredient purity.[19]

31.    This "premiumization" trend hinges on consumer trust in origin and production claims.[20] Premium tequilas are marketed on their use of 100% Blue Weber agave, traditional harvesting and distillation, and deliberate aging.[21] Consumers see these traits as markers of a superior product and are willing to pay more for bottles bearing those designations.[22] In this context, the "100% agave" label functions as shorthand for authenticity and value.[23]

32.    The premiumization trend is especially strong among younger consumers. According to Grand View Research, 54% of consumers age 34 and under prefer premium tequilas, citing taste, production integrity, and brand authenticity as major factors.[24] This demographic—accustomed to researching products before buying them—relies heavily on labels like "100% agave" to assess quality.[25]

33.    Tequilas labeled "100% agave" often command significantly higher prices than

---

[18] FN: Rachel King, The Tequila Boom: How Premium And Craft Spirits Are Changing The Industry, FORBES.COM (Jan. 5, 2025), https://www.forbes.com/sites/rachelking/2025/01/05/the-tequila-boom-how-premium-and-craft-spirits-are-changing-the-industry/.
[19] *Id.*
[20] King, *supra* note 9; Grand View Research, Tequila Market Size, Share & Trends Analysis Report by Product (Blanco, Reposado, Anejo, Super Premium), By Grade (Value, Premium, High-End Premium, Super Premium), By Distribution Channel, By Region, And Segment Forecasts, 2024-2030, GRANDVIEWRESEARCH.COM, https://www.grandviewresearch.com/industry-analysis/tequila-market-report (last visited June 6, 2025).
[21] Grand View Research, *supra* note 11; Heather Clark, From Agave To Your Glass: Everything You Need To Know About Making, Drinking, And Actually Enjoying Tequila, TASTINGTABLE.COM (Feb. 25, 2025), https://www.tastingtable.com/1792801/how-tequila-is-made-explained/; Diageo Bar Academy, Tequila: History and Production, DIAGEOBARACADEMY.COM, https://www.diageobaracademy.com/en-us/home/alcohol-categories/tequila-history-and-production (last visited June 5, 2025).
[22] Grand View Research, *supra* note 11; Clark, *supra* note 11; Diageo Bar Academy, *supra* note 11.
[23] Grand View Research, *supra* note 11.
[24] *Id.*
[25] *Id.*

mixto alternatives.[26] This price premium reflects both the increased cost of using only Blue Weber agave and the value consumers place on purity and traditional production methods. Research shows that consumers are not just buying tequila, they are buying what the label represents: authenticity, craftsmanship, and adherence to cultural and regulatory standards.[27]

34.    The "100% agave" label has become a cornerstone of brand positioning in the premium and super-premium tequila markets.[28] In an increasingly crowded spirits landscape, producers use this designation to stand apart from mass-produced alternatives and to appeal to consumers seeking high-quality, artisanal products.[29] The label helps justify higher prices, secure shelf space in upscale retailers, and earn consumer trust. Without the credibility of this claim, brands risk losing both prestige and profit.[30]

**C.    Diageo misrepresents its flagship tequilas as "100% Agave" to command premium prices.**

35.    Casamigos and Don Julio—both owned and marketed by Diageo—have aggressively leveraged the "100% agave" claim to justify premium pricing and secure market dominance. Their reputations and sales depend on promises of agave purity. But those representations are false.

36.    In 2017, Diageo acquired Casamigos, a super-premium tequila brand co-founded in 2013 by George Clooney, Rande Gerber, and Mike Meldman, in a deal valued at up to $1 billion.[31] This acquisition reflected the brand's rapid rise and premium positioning

37.    At the time, Diageo described Casamigos as "the fastest growing super-premium tequila brand in the U.S."[32] By 2023, Casamigos had become the world's fourth-largest tequila

---

[26] *Id.*

[27] King, *supra* note 11; Grand View Research, *supra* note 11.

[28] Grand View Research, *supra* note 11.

[29] *Id.*

[30] *Id.*

[31] Nicola Carruthers, *Diageo goes 'back to basics' with Casamigos*, THESPIRITSBUSINESS.COM (Feb. 6, 2025), https://www.thespiritsbusiness.com/2025/02/diageo-goes-back-to-basics-with-casamigos/.

[32] Diageo, *Diageo completes acquisition of super-premium tequila Casamigos*, DIAGEO.COM (Aug. 15, 2017), https://www.diageo.com/en/news-and-media/press-releases/2017/diageo-completes-acquisition-of-super-premium-tequila-casamigos.

brand, with global case sales topping 3 million.[33]

38.    On the official Casamigos website, in a section entitled "Our Tequila Process," Diageo claims: "We hand-selected the finest 100% Blue Weber agave, grown in rich clay soil of Mexico."[34] Doubling down on that claim, Diageo also includes "100% BLUE WEBER AGAVE" in much larger, bold font.[35]

39.    That claim carries through to the label. Every bottle of Casamigos Premium Tequila is stamped with "Tequila 100% Agave Azul," as shown in the screenshot below.

    

40.    Don Julio, also owned by Diageo, has played a major role in the company's expansion in the luxury tequila market.

41.    In fiscal year 2023, Don Julio's sales grew by 20%, outpacing Casamigos, which grew by 16%.[36] By 2024, Don Julio had become the best-selling tequila brand in the U.S. by retail value.[37]

42.    On its official website, Diageo calls Don Julio Blanco "tequila in its truest form"

---

[33] Carruthers, *supra* note 9.
[34] https://www.casamigos.com/en-us/our-process.
[35] *Id.*
[36] Isaac Lane, *Tequila Don Julio: Sipping on Culture, Pouring Profits in the Premium Spirits Race*, AINVEST.COM (May 29, 2025), https://www.ainvest.com/news/tequila-don-julio-sipping-culture-pouring-profits-premium-spirits-race-2505/.
[37] Oli Dodd, *Brands Report 2024: Tequila*, DRINKSINT.COM (Jan. 4, 2024), https://drinksint.com/news/fullstory.php/aid/10989/Brands_Report_2024:_Tequila.html.

and the "base from which all of [Don Julio's] other variants are derived."[38] Just below this statement, Diageo claims that Don Julio Blanco tequila is made from "100% BLUE WEBER AGAVE."[39] Diageo makes the same claim on the webpages for its Reposado,[40] Anejo,[41] 70 Cristalino,[42] Alma Miel,[43] Rosado,[44] 1942,[45] Ultima Reserva,[46] and Primavera[47] tequilas.

43.     Consistent with its online claims, every bottle of Don Julio Premium Tequila includes "100% de Agave" or "100% Agave" on the label, as shown in the screenshot below.



44.     Diageo knew that the Diageo Premium Tequila Products were not made from "100% agave," and that its labeling and marketing was false, misleading, and unlawful.

45.     In a market increasingly defined by premiumization, label integrity is not optional—it is essential. The "100% agave" designation is a material representation that

---

[38] https://www.donjulio.com/our-tequilas/don-julio-blanco-tequila.
[39] https://www.donjulio.com/our-tequilas/don-julio-blanco-tequila.
[40] https://www.donjulio.com/our-tequilas/don-julio-reposado-tequila.
[41] https://www.donjulio.com/our-tequilas/don-julio-anejo-tequila.
[42] https://www.donjulio.com/our-tequilas/don-julio-70-cristalino-tequila.
[43] https://www.donjulio.com/our-tequilas/don-julio-alma-miel.
[44] https://www.donjulio.com/our-tequilas/don-julio-rosado.
[45] https://www.donjulio.com/our-tequilas/don-julio-1942-tequila.
[46] https://www.donjulio.com/our-tequilas/don-julio-ultima-reserva.
[47] https://www.donjulio.com/our-tequilas/don-julio-primavera.

**CLASS ACTION COMPLAINT**

consumers rely on to select a product that match their values and expectations.[48]

46.    Misusing the "100% agave" label is not just a technical violation—it distorts consumer choice and marketplace competition. It allows Diageo to unjustly profit from the pricing power, trust, and loyalty typically reserved for authentic products. In a segment where small-batch producers and traditional distillers uphold rigorous standards, misuse of the "100% agave" label by mass-market brands dilutes the label's value and harms both consumers and honest competitors.

47.    For dominant players like Diageo, this is not just deceptive—it is a calculated, strategic misuse of market power.

**D.    Scientific testing exposes the misleading nature of Diageo's "100% agave" claims.**

48.    The seriousness of Diageo's misconduct cannot be overstated. By falsely labeling mass-produced Diageo Premium Tequila Products as "100% agave," Diageo not only deceives consumers—it undermines legitimate producers and distorts the market for authentic tequila.

49.    To verify the falsity of Diageo's claims, Plaintiff commissioned laboratory testing of Diageo's flagship tequilas using a scientifically validated method: carbon isotope ratio analysis. This technique, which is widely accepted in food chemistry, identifies the plant origin of ethanol in a spirit and detects adulteration.

50.    To determine whether tequila labeled as "100% agave" derives its alcohol solely from agave sugars, scientists measure the natural carbon fingerprint of the ethanol in the spirit. This fingerprint—known as a stable carbon isotope ratio ($\delta^{13}C$)—can be used to identify the plant source of the sugars used in fermentation.

51.    Specifically, researchers analyze the carbon composition at two parts of the ethanol molecule: the methylene group ($CH_2$) and the methyl group ($CH_3$). Ethanol made from Blue Weber agave, a CAM[49] plant, shows a distinct isotope signature compared to cheaper feedstocks like corn or sugarcane, which are $C_4$ plants.

---

[48] King, *supra* note 11; Grand View Research, *supra* note 11.
[49] CAM species (like Blue Weber agave) are plants that use a water-efficient form of photosynthesis. Unlike most plants, they open their stomata (the pores on their leaves) at night instead of during the day. This allows them to absorb carbon dioxide in cooler, more humid conditions, reducing water loss in the hot sun.

**CLASS ACTION COMPLAINT**

52.    A foundational 2010 study confirmed this distinction.[50] Ethanol made from $C_4$ plants such as corn and sugarcane consistently shows $\delta^{13}C(CH_2)$ values near –13.5‰.[51] In contrast, agave-derived ethanol falls within a range of –7.0‰ to –9.0‰.[52] The $CH_3$ position offers further separation: $C_4$-derived ethanol typically measures around –12.0‰, while agave-derived ethanol shows more negative values, between –15.0‰ and –17.0‰.[53] Ethanol from $C_3$ plants like sugar beets registers even lower, further validating the method's ability to identify ethanol sources.[54]

53.    Building on that foundation, a 2021 peer-reviewed study refined and validated a nuclear magnetic resonance (NMR) technique that measures $\delta^{13}C$ content at both the $CH_2$ and $CH_3$ positions.[55] These results confirmed the same diagnostic patterns: ethanol from pure agave sources consistently fell within the expected $\delta^{13}C$ ranges, while ethanol from $C_4$ plants, like cane and corn, displayed more negative values.[56] The study established precise benchmarks—$CH_2$ values below –10.0‰ are likely indicative of non-agave origin.[57]

54.    Together, these studies provide a scientifically validated, peer-reviewed framework for determining whether ethanol in a tequila sample truly comes from agave.

55.    Using that framework, Plaintiff commissioned laboratory analysis which applied validated carbon isotope testing to four Diageo tequila products labeled "100% Agave": Casamigos Blanco, Casamigos Reposado, Don Julio 1942 Blanco, and Don Julio 1942 Añejo.

56.    The tested samples yielded the following results:

**Casamigos Blanco**: $\delta^{13}C = -11.7‰$ (Estimated agave-derived ethanol: **33%**)

**Casamigos Reposado**: $\delta^{13}C = -11.2‰$ (Estimated agave-derived ethanol: **42%**)

---

[50] *See* Freddy Thomas, et al., Improved Characterization of the Botanical Origin of Sugar by Carbon-13 SNIF-NMR Applied to Ethanol, 58 J. AGRIC. FOOD CHEM. 11580, 11580-81 (2010).

[51] *Id.* at 11583.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] Vincent Portaluri, et al., Authentication of Agave Products through Isotopic Intramolecular [13]C Content of Ethanol: Optimization and Validation of [13]C Quantitative NMR Methodology, 1 ACS FOOD SCI. TECHNOL. 1316, 1316-17 (2021).

[56] *Id.* at 1320.

[57] *Id.*

**CLASS ACTION COMPLAINT**

**Don Julio 1942 Blanco**: $\delta^{13}C$ = −11.2‰ (Estimated agave-derived ethanol: **42%**)

**Don Julio 1942 Añejo**: $\delta^{13}C$ = −11.7‰ (Estimated agave-derived ethanol: **33%**)

57.     None of the tested samples came close to the threshold for ethanol derived entirely from agave sugars. In fact, all four fell well below 50%, strongly indicating that most of the alcohol in these products came from non-agave sources like corn or sugarcane.

58.     These findings directly contradict the prominent "100% Agave" labels on Diageo Premium Tequila Products and confirm that Diageo's representations are materially false and misleading.

**E.     Numerous news reports detail widespread tequila adulteration allegations.**

59.     Plaintiff's isotope testing reflects a broader concern within the tequila industry: that adulteration with non-agave alcohol is not only happening, but far more widespread than consumers realize.

60.     In January 2025, the Mexican business publication *Líder Empresarial* reported large-scale protests by thousands of agave growers, who accused major tequila producers of diluting their products with non-agave inputs such as cane alcohol.[58] These allegations were substantiated by the Consejo Mexicano del Agave (CMXDA), a national organization representing agave farmers, which confirmed that adulteration with cane-based spirits is both ongoing and widespread.[59]

61.     On January 13, 2025, *Mezcalistas*, a respected industry site, published an article accusing the CRT—the very organization charged with preserving tequila's integrity—of being "corrupt, in league with 'big tequila,' and tacitly supporting monopolistic practices that squeeze out small farmers."[60]

62.     The article claims the CRT has "been turning a profit by allowing some tequila

---

[58] Maria Hernandez Figueroa, Agaveros exigen «eliminar monopolios» en la Industria Tequilera, Líder Empresarial, LiderEmpresarial.com (Jan. 10, 2025), https://www.liderempresarial.com/agaveros-exigen-eliminar-monopolios-en-la-industria-tequilera/.
[59] *Id.*
[60] Felisa Rogers, What are you drinking? Agave farmers allege tequila industry corruption, MEZCALISTAS.COM (Jan. 13, 2025), https://www.mezcalistas.com/tequila-industry-corruption/.

**CLASS ACTION COMPLAINT**

corporations to mix cane or corn alcohol into tequila that's then labeled as 100 percent agave."[61] These "alarming charges" are reportedly backed by eyewitness accounts from agave farmers who "have seen trucks delivering cane alcohol to distilleries, and have gathered enough proof to merit a government investigation."[62]

63.    In a second *Mezcalistas* article, published January 15, 2025, Salvador Ibarra Landeros, the president of the Union Campesino Agavera (which translates roughly as "the rural agave union"), stated: "The tequila industry is regulated by the very same people who own the distilleries. The government has put the power in the hands of the CRT, which is an organization created for the businessmen. The people that work at the CRT respond to the orders of their bosses, the businessmen who appointed them. That's how these crimes happen."[63]

64.    That same article reported that agave farmers had planned to block tanker trucks from entering the Tequila region to prove that cane alcohol was being delivered to distilleries.[64] The tankers "could be viewed as evidence of foul play," the article explained, because "'cold mixing,' or adding cane or corn alcohol to tequila, is illegal under any circumstances."[65]

65.    Protest organizers ultimately "dialed back this action when recently elected Governor Pablo Lemus Navarro (of the Movimiento Ciudadano party) agreed to convene with the [agave farmers], the tequila executives, and the CRT to work on a solution."[66]

66.    The governor, however, failed to attend the promised meeting.[67] When asked for his response, CMXDA spokesperson Remberto Galván Cabrera stated: "The truth is that the tequila industry, the governor of the state, and the CRT are colluding. Yesterday I saw clearly that there isn't a human power on this earth that can get rid of the corruption of this nest of vipers."[68]

## V.    TOLLING

67.    Plaintiff incorporates and realleges the foregoing allegations by reference.

---

[61] *Id.*

[62] *Id.*

[63] Felisa Rogers, Agave farmers say they will no longer play nice, MEZCALISTAS.COM (Jan. 15, 2025), https://www.mezcalistas.com/breaking-tequila-news/.

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

**CLASS ACTION COMPLAINT**

68.    The statute of limitations applicable to Plaintiff's claim was tolled by Diageo's conduct and by Plaintiff's and Class Members' delayed discovery of their claims.

69.    As alleged in detail above, throughout the relevant time period, Diageo actively concealed and failed to disclose that Diageo Premium Tequila Products, all of which are marketed as "100% agave," are adulterated with non-agave alcohol. This concealment prevented Plaintiff and Class Members from learning the true composition of the Diageo Premium Tequila Products.

70.    Diageo knew that its misbranded "100% agave" Diageo Premium Tequila Products were adulterated with non-agave alcohol. Nevertheless, it knowingly engaged in, or conspired to engage in, misleading marketing and advertising campaigns portraying these products as being derived solely from the Blue Weber agave plant and compliant with Mexican legal standards for "100% agave" tequila.

71.    Because Diageo had superior knowledge about the production and adulteration of Diageo Premium Tequila Products, it had a duty to disclose the true nature and quality of those products to Plaintiff and Class Members.

72.    Diageo also knew that disclosing that the Diageo Premium Tequila Products are adulterated with non-agave alcohol would reduce or eliminate sales of Diageo Premium Tequila Products.

73.    Had Diageo disclosed the truth, Plaintiff and Class Members would have reviewed those disclosures and would not have purchased the Diageo Premium Tequila Products, or would have paid less for them and not paid a premium.

74.    Diageo intended for Plaintiff and Class Members to rely on its misrepresentations, omissions, and concealment regarding the Diageo Premium Tequila Products by actively concealing that the Diageo Premium Tequila Products are adulterated with non-agave alcohol. Plaintiff and Class Members justifiably relied on the misrepresentations, omissions, and concealment to their detriment.

75.    Given the highly technical nature of carbon isotope testing and the specialized knowledge required to detect adulteration, Plaintiff did not discover Diageo's unlawful conduct

1  until June 2025.

2      76.    At the time of purchase, Plaintiff and Class Members could not have discovered,

3  through reasonable diligence, that the Diageo Premium Tequila Products were adulterated and

4  Diageo had concealed that fact.

5      77.    Accordingly, all applicable statute of limitations are tolled under the discovery

6  rule as to claims that the Diageo Premium Tequila Products are adulterated with non-agave

7  alcohol.

8              **VI.    CLASS ACTION ALLEGATIONS**

9      78.    Plaintiff brings this lawsuit as a class action pursuant to Federal Rules of Civil

10  Procedure 23(a), (b)(1), (b)(2), (b)(3), and/or (c)(4), on behalf of herself and all others similarly

11  situated as members of the following Classes (collectively "the Classes"):

12          a.    **The Nationwide Class:** All persons who purchased Diageo Premium

13                Tequila Products in the United States.

14          b.    **The California Subclass:** All persons who purchased Diageo Premium

15                Tequila Products in California.

16      79.    Excluded from the Classes are: (1) any Judge or Magistrate presiding over this

17  action and any members of their immediate families; (2) Diageo, its subsidiaries, affiliates,

18  parents, successors, predecessors, and any entity in which Diageo has a controlling interest and

19  their current or former employees, officers, and directors; and (3) Plaintiff's counsel and

20  Diageo's counsel.

21      80.    **Numerosity**: The Class is so numerous that joinder of all Class members is

22  impracticable. Based on Plaintiff's investigation, Plaintiff believes that the Class includes

23  millions of Class members.

24      81.    **Predominant Common Questions**: Common questions of law and fact exist as

25  to all Class members and predominate over any questions solely affecting individual Class

26  members, including but not limited to:

27          a.    Whether Diageo made specific claims to consumers that its Diageo

28                Tequila Products are "Tequila 100% Agave Azul," "100% de Agave,"

and/or "100% Agave";

     b.     Whether Diageo knew the Diageo Premium Tequila Products labeled "100% Agave" were adulterated with non-agave alcohol;

     c.     Whether Diageo's conduct violates RICO and consumer protection statutes, and constitutes fraudulent concealment as alleged herein;

     d.     Whether Diageo engaged in a pattern or practice of racketeering, as alleged herein;

     e.     Whether Plaintiff and Class Members overpaid for Diageo Premium Tequila Products;

     f.     Whether Plaintiff and Class Members are entitled to equitable relief; and

     g.     Whether Plaintiff and Class Members are entitled to damages and other monetary relief and, if so, in what amount.

82.    **Typicality**: Plaintiff's claims are typical of the claims of the Class. The claims of Plaintiff and Class Members arise from the same conduct by Diageo and are based on the same legal theories.

83.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff and Plaintiff's counsel have no interest that is antagonistic to the interests of the Class, and Diageo has no defense unique to any Plaintiff or Class members. Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the Class, and they have the resources to do so. Neither Plaintiff, nor Plaintiff's counsel, have any interest adverse to the interests of any other Class member.

84.    **Superiority**: This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-

making. Class-wide damages are essential to compel Diageo to comply with state and federal law. Moreover, because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of Diageo's financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

85.    **Injunctive Relief**: Plaintiff also satisfies the requirements for maintaining a class under Rule 23(b)(2). Diageo acted on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

86.    **Particular Issues**: Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). Plaintiff's claims are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violations of the Racketeer Influenced and Corrupt Organizations Act

### 18 U.S.C. § 1962(c)-(d)

### (On behalf of the Nationwide Class)

87.    Plaintiff incorporates and realleges the foregoing factual allegations by reference.

88.    Plaintiff brings this claim for herself and on behalf of the Nationwide Class against Diageo.

89.    Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

90.    Plaintiff is entitled to a civil remedy for any violation of 18 U.S.C. § 1962 for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c).

91.     Diageo is liable under 18 U.S.C. § 1962(c) because it conducted or participated in the conduct of the affairs of an "association-in-fact enterprise" through a pattern of racketeering activity. Diageo is also liable under 18 U.S.C. § 1962(d) because it conspired to violation 18 U.S.C. § 1962(c).

92.     As a direct and proximate result of its fraudulent scheme and common course of conduct described throughout this Complaint, Diageo was able to extract billions of dollars from Plaintiffs and Class Members.

### THE ADULTERATED TEQUILA ENTERPRISE

93.     At all relevant times, Diageo has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, a "legal or beneficial interest in property."

94.     Diageo conducted and participated in the conduct of an association-in-fact enterprise as defined in 18 U.S.C. § 1961(4) (hereinafter the "Adulterated Tequila Enterprise"). Members of the Adulterated Tequila Enterprise include Diageo, Diageo México, CRT, and other individuals and entities, including unknown third parties, involved in producing, verifying, bottling, labeling, certifying, marketing, advertising, and selling Diageo Premium Tequila Products.

95.     The Adulterated Tequila Enterprise was and continues to be characterized by a common purpose, relationships among the members of the Adulterated Tequila Enterprise, and sufficient longevity to accomplish the common purpose thereof. Notably, CRT was formed in 1994 and the Adulterated Tequila Enterprise has continued for at least that long. Diageo and each member of the Adulterated Tequila Enterprise conducted and participated in the conduct of the Adulterated Tequila Enterprise through a pattern of racketeering activity.

96.     The Adulterated Tequila Enterprise was formed for the common purpose of illegally profiting from the sale of Diageo Premium Tequila Products that were falsely labeled as "100% Agave" tequila. The Adulterated Tequila Enterprise fulfilled the common purpose by ensuring that Diageo obtained a false certification of Diageo Premium Tequila Products as "100% Agave" tequila in order to sell them in the United States at a premium price.

97.     At all relevant times, the Adulterated Tequila Enterprise: (a) had an existence

**CLASS ACTION COMPLAINT**

separate and distinct from Diageo; (b) was separate and distinct from the pattern of racketeering in which Diageo engaged; and (c) was an ongoing organization consisting of legal entities.

98.     While Diageo participated in and is a member of the Adulterated Tequila Enterprise, it has a separate existence that is distinct from the Adulterated Tequila Enterprise, including distinct legal status, different offices and role, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

99.     The Adulterated Tequila Enterprise is characterized by ongoing relationships among its members. For example, Diageo and Diageo Mexico are part of the same corporate family. Diageo Mexico is the First Vice President of the Board of Directors of CRT, and serves as the Chairman of CRT's Committee for the Safety of the Agave-Tequila Production Chain and the Sustainability Committee.

100.     Within the Adulterated Tequila Enterprise, there was a common communication network through which Diageo and members of the Adulterated Tequila Enterprise shared information on a regular basis. The Adulterated Tequila Enterprise used this communication network for the purpose of furthering its common purpose and conducting its pattern of racketeering activities.

101.     Diageo and each member of the Adulterated Tequila Enterprise conducted and participated in the conduct of the Adulterated Tequila Enterprise by engaging in a pattern of racketeering activity to further the common purpose of the Adulterated Tequila Enterprise. Diageo exercised control over, directed, and participated in the operation and management of the Adulterated Tequila Enterprise by directing its affairs and using members of the Adulterated Tequila Enterprise as instrumentalities to carry out the fraudulent scheme of the Adulterated Tequila Enterprise and further its common goals.

102.     In particular, Diageo produced, bottled, and labeled the Diageo Premium Tequila Products as "Tequila 100% Agave Azul," "100% de Agave," and/or "100% Agave" knowing that the Diageo Premium Tequila Products were, in fact, adulterated with non-agave alcohols in violation of U.S. and Mexican law. Diageo worked with Diageo Mexico and CRT to ensure that testing results did not reveal that Defendants' Diageo Premium Tequila Products contained non-

agave sugars, and to ensure that CRT granted a false certification of the Diageo Premium Tequila Products as "100% Agave" tequila. Diageo also marketed, advertised, and sold the Diageo Premium Tequila Products with knowledge that the "100% Agave" claims on every bottle of its tequila were false and misleading because the Diageo Premium Tequila Products were adulterated with non-agave alcohols.

103.    To secure the "100% Agave" certification, Diageo is required to pay CRT for laboratory analyses, certifications, and compliance audits under the Tequila NOM. CRT authorizes tequila labels—e.g., "100% Agave"—and issues Tequila NOM and U.S. Department of Transportation registration numbers.

104.    Diageo Mexico and CRT knew of, supported, and participated in the Adulterated Tequila Enterprise by coordinating their own conduct to further the common purpose of the Adulterated Tequila Enterprise. For example, CRT verified and certified that Diageo Premium Tequila Products complied with the Tequila NOM even though they knew, or should have known from the required inspections throughout the tequila production chain, that the Diageo Premium Tequila Products were adulterated with non-agave alcohols. Moreover, both Diageo Mexico and CRT knew that Diageo's "100% Agave" claims were false and misleading representations, yet they stayed silent to further the common purpose of the Adulterated Tequila Enterprise.

105.    Each member of the Adulterated Tequila Enterprise shared in the bounty generated by the enterprise—*i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud consumers nationwide.

106.    The Adulterated Tequila Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, advertisement, and sale or lease of the Diageo Premium Tequila Products throughout the country, and the receipt of monies from the sale of the same.

## THE PREDICATE ACTS

107.    The Adulterated Tequila Enterprise's common purpose of illegally profiting from the sale of Diageo Premium Tequila Products that were falsely labeled as "100% Agave" tequila was facilitated by a pattern of mail and wire fraud. The Adulterated Tequila Enterprise's scheme

constitutes racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c), by using mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) & 1343 (wire fraud).

108.    Specifically, Diageo has committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 & 1343). The multiple acts of racketeering activity were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Diageo's regular and knowing use of the facilities, services, distribution channels, and employees of the Adulterated Tequila Enterprise. Diageo knowingly and intentionally participated in the scheme to defraud by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

109.    Diageo devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiff and the Nationwide Class or to obtain money from Plaintiff and the Nationwide Class using materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

110.    Diageo's predicate acts of racketeering, 18 U.S.C. § 1961(1), include but are not limited to:

      a.   **Mail Fraud**: Diageo violated 18 U.S.C. § 1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to defraud by producing, verifying, bottling, labeling, certifying, marketing, advertising, and selling Diageo Premium Tequila Products by means of false pretenses, misrepresentations, promises, and omissions.

      b.   **Wire Fraud:** Diageo violated 18 U.S.C. § 1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire to execute the unlawful scheme to defraud by producing, verifying, bottling, labeling, certifying, marketing, advertising, and selling Diageo

Premium Tequila Products by means of false pretenses, misrepresentations, promises, and omissions.

111.    Diageo's use of the mails and wires includes, but is not limited to, the transmission, delivery, and shipment of the following by Diageo and members of the Adulterated Tequila Enterprise in furtherance of their scheme to defraud:

     a.    the Diageo Premium Tequila Products;

     b.    documents and information related to testing of the Diageo Premium Tequila Products;

     c.    false and misleading certifications that the Diageo Premium Tequila Products are "100% Agave" tequila;

     d.    false and misleading communications to the public;

     e.    sales and marketing materials, including advertising, websites, and product labeling, which misrepresented, omitted, and concealed the true nature of the Diageo Premium Tequila Products;

     f.    emails, communications and correspondence to coordinate the affairs of the Adulterated Tequila Enterprise including, but not limited to, communications with CRT and its members; and

     g.    emails, communications and correspondence related to all of the foregoing.

112.    The mail and wire transmissions described herein were made in furtherance of Diageo's scheme and common course of conduct to deceive consumers and lure them into purchasing the Diageo Premium Tequila Products, which Diageo knew were adulterated with non-agave alcohols and, therefore, did not contain "100% Agave" alcohol.

113.    Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate wire facilities are hidden from Plaintiff and Class Members, and cannot be alleged without access to Diageo's books and records, and the books and records of members in the Adulterated Tequila Enterprise. However, Plaintiff has described the types of predicate acts of mail and/or wire fraud that occurred.

114.    Diageo has not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Diageo conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this complaint, have participated as co-conspirators with Diageo in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Diageo and its unnamed co-conspirators throughout the illegal scheme and common course of conduct.

115.    Diageo aided and abetted others in violating the above laws, thereby rendering it indictable as a principal in the 18 U.S.C. §§ 1341 & 1343 offenses.

116.    To achieve its common goals, Diageo actively and intentionally concealed from the general public the unlawfulness of the Diageo Premium Tequila Products.

117.    Diageo and each member of the conspiracy, with knowledge and intent, has agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in producing, verifying, bottling, labeling, certifying, marketing, advertising, and selling the Diageo Premium Tequila Products.

118.    Indeed, for the conspiracy to succeed Diageo, CRT, and their co-conspirators had to agree to implement and use similar devices and fraudulent tactics including, but not limited to, complete secrecy about the adulterated Diageo Premium Tequila Products.

119.    Diageo knew and intended that Plaintiff and Class Members would rely on the material misrepresentations and omissions made by it about the Diageo Premium Tequila Products. Diageo knew and intended that consumers would incur damages as a result.

120.    Plaintiff and millions of other consumers relied upon Diageo's misrepresentations, omissions, and concealment. Plaintiff's reliance is made evident by the fact that they purchased the Diageo Premium Tequila Products that did not comply with the Tequila NOM and which never should have been introduced into the U.S. stream of commerce.

121.    As described herein, Diageo engaged in a pattern of related and continuous predicate acts. These predicate acts constituted various unlawful activities, each conducted with

the common purpose of obtaining significant monies and revenues from Plaintiff and Class Members based on their misrepresentations, omissions, and concealment, while providing Diageo Premium Tequila Products worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

122.    All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Adulterated Tequila Enterprise. The racketeering acts committed by the Adulterated Tequila Enterprise employed a similar method, were related, with a similar purpose, and they involved similar participants, with a similar impact on Plaintiff and Class Members.

123.    The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

124.    The predicate acts all generated significant revenue and profits for Diageo at the expense of Plaintiff and Class Members. The predicate acts were committed or caused to be committed by Diageo through its participation in the Adulterated Tequila Enterprise and furtherance of its fraudulent schemes.

125.    By reason of and as a result of the conduct of Diageo, and in particular its pattern of racketeering activity, Plaintiff and Class Members have been injured in multiple ways, including but not limited to:

a.    Plaintiff overpaid for the Diageo Premium Tequila Products at the time of purchase. Plaintiff would not have purchased Diageo Premium Tequila Products if Diageo truthfully disclosed the products were adulterated with non-agave alcohols and, therefore, not "100% Agave." Alternatively, Plaintiff would not have paid a premium for the Diageo Premium Tequila Products if proper disclosures had been made.

b.    Plaintiff has been wrongfully deprived of their property in that deliberate misrepresentations, omissions, and concealment artificially inflated the price for the Diageo Premium Tequila Products.

126.    Diageo's violations of 18 U.S.C. § 1962(c) & (d) have directly and proximately caused injuries and damages to Plaintiff and Class Members, and Plaintiff and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### SECOND CAUSE OF ACTION

### Violations of California's Consumers Legal Remedies Act

### Cal. Civ. Code § 1750, *et seq.*

### (On behalf of the California Subclass)

127.    Plaintiff incorporates and realleges the foregoing factual allegations by reference.

128.    Plaintiff brings this claim for herself and on behalf of the California Subclass against Diageo under California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq*.

129.    The Diageo Premium Tequila Products are "goods" as defined in Cal. Civ. Code § 1761(a).

130.    Plaintiff and the other California Subclass members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiff, California Subclass members, and Diageo are "persons" as defined in Cal. Civ. Code § 1761(c).

131.    The purchase of the Diageo Premium Tequila Products by Plaintiff and the California Subclass members constitutes "transactions" as defined in Cal. Civ. Code § 1761(e).

132.    The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices . . . undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

133.    Diageo violated Cal. Civ. Code § 1770(a) by, among other things: misrepresenting the source, approval, or certification of the Diageo Premium Tequila Products; misrepresenting the affiliation, connection, or association with, or certification by, another; representing that the Diageo Premium Tequila Products have characteristics, ingredients, or quantities which they do not have; representing that the Diageo Premium Tequila Products are of a particular standard, quality, or grade, when they are of another; advertising the Diageo Premium Tequila Products

with intent not to sell them as advertised; and representing that the Diageo Premium Tequila Products have been supplied in accordance with a previous representation when they have not. *See* Cal. Civ. Code §§ 1770(a)(2), (a)(3), (a)(5), (a)(7), (a)(9), and (a)(16).

134.    Diageo's unfair and deceptive acts or practices occurred repeatedly in Diageo's course of trade or business, were material, and were capable of deceiving a significant portion of the general consuming public.

135.    Diageo knew that the Diageo Premium Tequila Products were adulterated with non-agave alcohol and should not have been certified, labeled, marketed, and/or advertised as "100% Agave."

136.    Diageo owed a duty to Plaintiff and California Subclass members to disclose that the Diageo Premium Tequila Products are not "100% agave" because it possessed exclusive knowledge that the Diageo Premium Tequila Products were adulterated with non-agave alcohol, intentionally concealed the foregoing from Plaintiff and California Subclass members, and made misleading and incomplete representations regarding the agave sugar content of the Diageo Premium Tequila Products.

137.    In failing to disclose the true nature of the Diageo Premium Tequila Products, Diageo knowingly and intentionally concealed material facts and breached its duty to Plaintiff and California Subclass members. Diageo knew or should have known that its conduct would mislead consumers about the true nature of the Diageo Premium Tequila Products,

138.    Diageo's knowing and intentional misrepresentations and omissions were material in that a reasonable consumer would have considered them important in deciding whether to purchase the Diageo Premium Tequila Products.

139.    Plaintiff purchased the Diageo Premium Tequila Products in reliance on Diageo's knowing and intentional misrepresentations and omissions. That reliance was reasonable, as they had no way of discerning that Diageo's representations were false and misleading, or otherwise learning the true nature of the Diageo Premium Tequila Products.

140.    Absent Diageo's misrepresentations and omissions, Plaintiff and California Subclass members would not have purchased the Diageo Premium Tequila Products or would

have paid significantly less than they did for them.

141.    Had Diageo adequately disclosed the truth about the Diageo Premium Tequila Products through the same advertising mediums it advertised them as "100% agave," Plaintiff would have seen those disclosures.

142.    As a result of Diageo's unfair and deceptive acts or practices, Plaintiff and California Subclass members suffered actual damages in that the adulterated Diageo Premium Tequila Products are not "100% Agave," and, therefore, are not worth the premium price Plaintiff and California Subclass members paid.

143.    Plaintiff and California Subclass members seek an order enjoining Diageo's unfair and deceptive acts or practices, equitable relief, and award of attorneys' fees and costs under Cal. Civ. Code § 1780(e), and any other relief available under the CLRA. Plaintiff and members of the public will suffer irreparable injury without an injunction, as they have an interest in buying Diageo Premium Tequila Products in the future but have no way of determining whether they are made with "100% agave."

144.    Plaintiff will send a notice letter to Diageo in accordance with Cal. Civ. Code § 1782(a) of the CLRA, notifying Diageo of its alleged violations of Cal. Civ. Code § 1770(a) and demanding that Diageo correct or agree to correct the actions described therein within thirty (30) days of the notice letter. If Diageo fails to do so, Plaintiff will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiffs and California Subclass members are entitled under the CLRA.

145.    Attached hereto as Exhibit A is the Venue Declaration of Plaintiff Jackson required by Cal. Civ. Code § 1780(d).

146.    Plaintiff pleads this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3). Additionally, Plaintiff has no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Diageo's alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

**THIRD CAUSE OF ACTION**

**Violations of California's False Advertising Law**

**Cal. Bus. & Prof. Code § 17500, *et seq.***

**(On behalf of the California Subclass)**

147.    Plaintiff incorporates and realleges the foregoing factual allegations by reference.

148.    Plaintiff brings this claim for herself and on behalf of the California Subclass against Diageo.

149.    California's False Advertising Law ("FAL") makes its "unlawful for any person, firm, corporation or association . . . to make or disseminate or cause to be made or disseminated . . . any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

150.    Diageo caused to be made or disseminated throughout California, through advertising, marketing, and other publications, untrue and misleading statements that the Diageo Premium Tequila Products are "100% agave." Diageo's untrue and misleading statements were likely to deceive a significant portion of the general consuming public.

151.    Diageo knew that the Diageo Premium Tequila Products were adulterated with non-agave alcohol and should not have been certified, labeled, marketed, and/or advertised as "100% Agave."

152.    Diageo was under a duty to Plaintiff and California Subclass members to disclose that the Diageo Premium Tequila Products are "100% agave" because it possessed exclusive knowledge that the Diageo Premium Tequila Products were adulterated with non-agave alcohol, intentionally concealed the foregoing from Plaintiff and California Subclass members, and made misleading and incomplete representations regarding the agave sugar content of the Diageo Premium Tequila Products.

153.    In failing to disclose the true nature of the Diageo Premium Tequila Products, Diageo knowingly and intentionally concealed material facts and breached its duty to Plaintiff and California Subclass members. Diageo knew or should have known that its conduct would

mislead consumers about the true nature of the Diageo Premium Tequila Products.

154.    Diageo's knowing and intentional misrepresentations and omissions are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Diageo Premium Tequila Products at the price offered.

155.    Plaintiff purchased the Diageo Premium Tequila Products in reliance on Diageo's knowing and intentional misrepresentations and omissions. That reliance was reasonable, as they had no way of discerning that Diageo's representations were false and misleading, or otherwise learning the true nature of the Diageo Premium Tequila Products.

156.    Absent Diageo's misrepresentations and omissions, Plaintiff and California Subclass members would not have purchased the Diageo Premium Tequila Products or would have paid significantly less than they did for them.

157.    Had Diageo adequately disclosed the truth about the Diageo Premium Tequila Products through the same advertising mediums it advertised them as "100% agave," Plaintiff would have seen those disclosures.

158.    As a direct and proximate result of Diageo's misrepresentations and omissions, consumers have been and are being harmed. Plaintiff and California Subclass members have suffered injury and actual out-of-pocket losses as a result of Diageo's FAL violations.

159.    Plaintiff brings this action pursuant to Cal. Bus. & Prof. Code § 17535 for injunctive relief to enjoin the practices described herein. Plaintiff and California Subclass members are entitled to: (a) an order requiring Diageo to cease the acts of unfair competition alleged herein; (b) full restitution of all monies paid to Diageo as a result of its deceptive practices; (c) interest at the highest rate allowable by law; and (d) the payment of Plaintiff's attorneys' fees and costs pursuant to, inter alia, California Code of Civil Procedure § 1021.5.

160.    Plaintiff pleads this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3). Additionally, Plaintiff has no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Diageo's alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to

prevent.

## FOURTH CAUSE OF ACTION

### Violations of California's Unfair Competition Law

### Cal. Bus. & Prof. Code § 17200, *et seq.*

### (On behalf of the California Subclass)

161.    Plaintiff incorporates and realleges the foregoing factual allegations by reference.

162.    Plaintiff brings this claim for herself and on behalf of the California Subclass against Diageo.

163.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

164.    Diageo's conduct, as described herein, was and is unfair, deceptive, and unlawful, in violation of the UCL.

165.    Diageo knew that the Diageo Premium Tequila Products were adulterated with non-agave alcohol and, therefore, under applicable Tequila NOM standards, should not have been certified, labeled, marketed, and/or advertised as "100% Agave."

166.    Diageo was under a duty to Plaintiff and California Subclass members to disclose that the Diageo Premium Tequila Products are "100% agave" because it possessed exclusive knowledge that the Diageo Premium Tequila Products were adulterated with non-agave alcohol, intentionally concealed the foregoing from Plaintiff and California Subclass members, and made misleading and incomplete representations regarding the agave sugar content of the Diageo Premium Tequila Products.

167.    Diageo's conduct was fraudulent in at least the following ways:

168.    By knowingly and intentionally failing to disclose that the Diageo Premium Tequila Products were adulterated with non-agave alcohol;

169.    By knowingly and intentionally misrepresenting that the Diageo Premium Tequila Products comply with all applicable standards under the Tequila NOM for "100% Agave" tequila products; and

**CLASS ACTION COMPLAINT**

170.    By knowingly and intentionally selling Diageo Premium Tequila Products that are misbranded as "100% Agave."

171.    Diageo's knowing and intentional misrepresentations and omissions alleged herein were intended to cause, and did cause, Plaintiff and the California Subclass members to make their purchases of the Diageo Premium Tequila Products. Diageo knew or should have known that its conduct would mislead consumers about the true nature of the Diageo Premium Tequila Products.

172.    Plaintiff purchased the Diageo Premium Tequila Products in reliance on Diageo's knowing and intentional misrepresentations and omissions. That reliance was reasonable, as they had no way of discerning that Diageo's representations were false and misleading, or otherwise learning the true nature of the Diageo Premium Tequila Products.

173.    Absent Diageo's misrepresentations and omissions, Plaintiff and California Subclass members would not have purchased the Diageo Premium Tequila Products or would have paid significantly less than they did for them.

174.    Had Diageo adequately disclosed the truth about the Diageo Premium Tequila Products through the same advertising mediums it advertised them as "100% agave," Plaintiff would have seen those disclosures.

175.    Accordingly, Plaintiff and California Subclass members have suffered ascertainable loss and actual damages as a direct and proximate result of Diageo's misrepresentations, their concealment of and failure to disclose material information, and their unlawful and unfair conduct.

176.    Additionally, Diageo's acts and practices described above are unfair under the UCL because they offend established public policy regarding misleading advertising and the harm caused to consumers greatly outweighs any benefits associated with those practices. Diageo's conduct has also impaired competition within the premium tequila market and has prevented Plaintiff and California Subclass members from making fully informed decisions about whether to purchase the Diageo Premium Tequila Products and/or the price to purchase them.

**CLASS ACTION COMPLAINT**

177.    Diageo's conduct, as described herein, was and is unlawful in violation of the UCL in that Diageo violated the laws alleged above, including California consumer protection laws. Further, Diageo's conduct is unlawful under the UCL in that Diageo violated California's Sherman Food, Drug, and Cosmetic Law (Cal. Health & Safety Code § 109875, *et seq.*), which prohibits misbranding "food," including alcoholic beverages. *See* Cal. Health & Safety Code § 109935; *id.* § 110660.

178.    Plaintiff requests that this Court enter such orders or judgments as may be necessary to restore to Plaintiff and members of the California Subclass any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345, and for such other relief as may be appropriate.

179.    Plaintiff also seeks an injunction enjoining Diageo's misconduct alleged herein. Plaintiff and members of the public will suffer irreparable injury without an injunction, as they have an interest in buying Diageo Premium Tequila Products in the future but have no way of determining whether they are made with "100% agave."

180.    Plaintiff pleads this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3). Additionally, Plaintiff has no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Diageo's alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

## FIFTH CAUSE OF ACTION

## Unjust Enrichment

## (On behalf of the California Subclass)

181.    Plaintiff incorporates and realleges the foregoing factual allegations by reference.

182.    Plaintiff brings this claim for herself and on behalf of the California Subclass against Diageo.

183.    Diageo has been unjustly enriched in that it knowingly and intentionally sold

**CLASS ACTION COMPLAINT**

Diageo Premium Tequila Products that are misbranded as "100% Agave."

184.    Diageo knew that the Diageo Premium Tequila Products were adulterated with non-agave alcohol and, therefore, under applicable Tequila NOM standards, should not have been certified, labeled, marketed, and/or advertised as "100% Agave."

185.    Plaintiff and California Subclass members received less than what they paid for in that the Diageo Premium Tequila Products are not "100% Agave" tequila.

186.    Plaintiff and California Subclass members conferred a benefit on Diageo by purchasing, and paying a premium for, the Diageo Premium Tequila Products. Had Plaintiff and California Subclass members known the adulterated Diageo Premium Tequila Products are not "100% agave," they would not have purchased the Diageo Premium Tequila Products or would have paid significantly less for them.

187.     Diageo should therefore be required to disgorge all profits, benefits, and other such compensation it obtained through its wrongful conduct.

188.    Plaintiff pleads this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3).

## VIII.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, respectfully requests that the Court:

a.    certify the proposed Classes, appoint Plaintiff as the class representative, appoint Plaintiff's Counsel as Class Counsel, and make such further orders for the protection of Class Members as the Court deems appropriate;

b.    enjoin Diageo from engaging in the unlawful conduct alleged herein, and order such other injunctive relief that the Court deems just and proper;

c.    award damages to Plaintiff and the Class, including punitive damages, statutory damages, costs, and disgorgement in an amount to be determined at trial, except that monetary relief under the CLRA, as stated above, shall be limited prior to completion of the applicable notice requirements;

d.    award Plaintiff and Class Members pre- and post-judgment interest as

permitted by law;

    e.    award Plaintiff and Class Members reasonable litigation expenses and attorneys' fees as permitted by law;

    f.    enter an order holding Diageo financially responsible for all Class notice and the administration of Class relief;

    g.    enter judgment in favor of Plaintiff and Class Members; and

    h.    order such other or further relief as the Court may deem appropriate, just, and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable as of right.

Dated: July 4, 2025

Respectfully submitted,

/s/ *Roland Tellis*

**BARON & BUDD, P.C.**
Roland Tellis (SBN 186269)
rtellis@baronbudd.com
David Fernandes (SBN 280944)
dfernandes@baronbudd.com
Isaac Miller (SBN 266459)
imiller@baronbudd.com
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818.839.2333
Facsimile: 214.279.9915

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (*pro hac vice* application forthcoming)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Nathaniel A. Tarnor (*pro hac vice* application forthcoming)
594 Dean Street, Suite 24
Brooklyn, NY 11238
Telephone: (646) 543-4992
NathanT@hbsslaw.com

*Attorneys for Plaintiff and the Proposed Class*

**CLASS ACTION COMPLAINT**